IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

```
FILED
IN OPEN COURT

JUN 2 4 2015

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA
```

| | |
|---|---|
| UNITED STATES OF AMERICA | )<br>)<br>) |
| v. | )<br>) No. 1:15cr 178 |
| | ) |
| HAROLD BAILEY GALLISON II, | ) **COUNT ONE:** |
|   a/k/a "B.J. GALLISON," | )    Conspiracy to Commit Wire Fraud |
|   a/k/a "Bart Williams," | )      18 U.S.C. § 1349 |
|   (Counts 1-5) | ) |
| | ) **COUNT TWO:** |
| MICHAEL J. RANDLES, | )    Securities Fraud |
|   (Count 5) | )      15 U.S.C. §§ 78j(b) & 78ff |
| | ) |
| ANN MARIE HISKEY, | ) **COUNT THREE:** |
|   (Counts 1-5) | )    Conspiracy to Commit Wire Fraud |
| | )      18 U.S.C. § 1349 |
| ROGER G. COLEMAN, | ) |
|   (Count 5) | ) **COUNT FOUR:** |
| | )    Securities Fraud |
| CARL H. KRUSE, SR., | )      15 U.S.C. §§ 78j(b) & 78ff |
|   (Counts 1 & 2) | ) |
| | ) **COUNT FIVE:** |
| CARL H. KRUSE, JR., | )    Money Laundering Conspiracy |
|   (Counts 1 & 2) | )      18 U.S.C. § 1956(h) |
| | ) |
| FRANK J. ZANGARA, | ) |
|   (Counts 3 & 4) | ) **FORFEITURE NOTICE** |
| | ) |
| MARK S. DRESNER, and | ) |
|   (Counts 3 & 4) | ) |
| | ) |
| CHARLES S. MOELLER, | ) |
|   (Counts 3 & 4) | ) |
| | ) |
|   Defendants. | ) |

## INDICTMENT

June 2015 Term – At Alexandria, Virginia

THE GRAND JURY CHARGES THAT:

At all times relevant to this Indictment:

GENERAL ALLEGATIONS

*The Defendants and Related Entities*

1.  Defendant Harold Bailey GALLISON II, a/k/a "B.J. Gallison," a/k/a "Bart Williams," was a resident of California. GALLISON controlled and operated Sandias Azucaradas, also known at various times as Moneyline Brokers and Trinity Asset Services (collectively, "Moneyline"). Moneyline was an offshore brokerage company located in San Jose, Costa Rica, which was founded in or around 2002. The purpose of Moneyline was to trade securities, primarily microcap or "penny stocks," through multiple nominee brokerage accounts in the United States, often in connection with market manipulation or "pump-and-dump" securities fraud schemes, and to launder the proceeds of these schemes by transferring the proceeds from the nominee brokerage accounts to and through Moneyline nominee bank accounts in the United States and overseas.

2.  Defendant Michael J. RANDLES was a Canadian citizen who was a resident of Costa Rica. RANDLES's role was, among other things, to direct the operations of Moneyline from Costa Rica when GALLISON was in California, and to cause the opening of Moneyline brokerage and bank accounts that were used to facilitate pump-and-dump schemes that ran through Moneyline. The accounts were used in part to conceal the true source, ownership and control of the shares and the proceeds of the liquidation of the shares.

3.  Defendant Ann Marie HISKEY was a resident of Costa Rica. HISKEY was a trader and customer service representative at Moneyline whose role was, among other things, to

-2-

engage in trading stocks through Moneyline's accounts, to assist in finding promoters for the stocks being traded, and to facilitate the transfer of the proceeds of the trades.

4.       Defendant Roger G. COLEMAN was a resident of Nevada. COLEMAN's role was, among other things, to cause the opening of, and be the signatory on, Moneyline brokerage and bank accounts that were used to facilitate pump-and-dump schemes that ran through Moneyline. COLEMAN established such accounts in the Eastern District of Virginia and elsewhere, including a brokerage account in Merrifield, Virginia, that was used to liquidate shares of Bryn Resources, Inc. ("Bryn Resources"). The accounts were used in part to conceal the true source, ownership and control of the shares and the proceeds of the liquidation of the shares.

5.       Defendant Carl H. KRUSE, JR. was a resident of Florida. KRUSE, JR., and his father, Carl H. KRUSE, SR., controlled almost all of the shares of Warrior Girl Corporation ("Warrior Girl").

6.       Defendant Carl H. KRUSE, SR., was a resident of Florida. KRUSE, SR., was an officer of Warrior Girl and with his son, KRUSE, JR. controlled almost all of the shares of Warrior Girl.

7.       Defendant Frank J. ZANGARA was a resident of New York. ZANGARA controlled almost all of the shares of Everock Incorporated ("Everock") with defendant Charles S. MOELLER. ZANGARA was also the beneficial owner of BHI Group, Glenwood Marketing and UDF Consulting.

8.       Defendant Charles S. MOELLER was a resident of New York. MOELLER served as the President of Everock and controlled almost all of the Everock free trading shares

with defendant ZANGARA. MOELLER also operated a website that promoted microcap stocks, including Everock, and purported "to provide a balanced view of many promising small-cap companies that would otherwise fall under the radar of the typical Wall Street investor."

9.     Defendant Mark S. DRESNER was a resident of New York. DRESNER facilitated the drafting of press releases touting Everock's purported business activities that were issued in connection with the promotion of Everock stock. DRESNER was the owner and operator of Digital Edge Marketing, a company that maintained an account at Moneyline that held Everock shares and was used to transfer shares to promoters in connection with the promotion of Everock.

*Other Co-Conspirators*

10.     Co-Conspirator 1 ("CC1") was a resident of California. CC1 was a "client" of Moneyline who was recruited by GALLISON to participate in the promotion of the shares of Warrior Girl.

11.     Co-Conspirator 2 ("CC2") was a resident of California. CC2 served as a Secretary of Everock and was involved in facilitating the issuance of press releases touting Everock's purported business activities in connection with the promotion of Everock stock. CC2 operated a company called Core Business One that purported to be an investor that provided financing for Everock.

12.     Co-Conspirator 3 ("CC3") was a resident of New Jersey. CC3 was a client of Moneyline who acted as a promoter for Everock.

*The Over-The-Counter Market*

13.     The Over-the-Counter ("OTC") securities market was the equity market for securities not listed on a United States stock exchange, such as the New York Stock Exchange,

-4-

or the NASDAQ Stock Market.  In general, securities are usually traded in the OTC market

because the company is unable to meet the requirements to be listed on one of the United States

stock exchanges.  OTC securities are traded by broker-dealers who negotiate directly with one

another over computer networks and by phone.

14.     The OTC market was linked by computer networks, and quotations for OTC

securities may be quoted on listing services such as OTC Markets Group, Inc. ("OTC Markets

Group"), formerly known as the Pink Sheets, which was an inter-dealer electronic quotation and

trading system in the OTC securities market.

15.     "Microcap" or "penny" stocks referred to stocks of publicly traded U.S.

companies which have a low market capitalization.  Microcap stocks were traded on the OTC

market.  Microcap stocks were often subject to price manipulation because they were thinly

traded and subject to less regulatory scrutiny than stocks that traded on exchanges like the New

York Stock Exchange.  Additionally, large blocks of microcap stock were often controlled by a

small group of individuals, which enabled those in the group to control or orchestrate

manipulative trading in those stocks.

<em>"Pump-and-Dump" Schemes</em>

16.     Generally, a "pump-and-dump" scheme involved the artificial manipulation of the

price and/or trading volume of a particular stock in order to sell that stock at an artificially

inflated price.  As part of a pump-and-dump scheme, an individual or group of individuals

obtained control over a substantial portion of the free trading shares of a company.  Free trading

shares were shares of stock that could be traded without restriction.  One of the first steps in

executing a pump-and-dump scheme involved the co-conspirators gaining control over all or the

-5-

vast majority of the free trading shares in a company to control the market for the stock free from outside, market influences.

17.    A pump-and-dump scheme also involved "parking" shares by depositing or transferring them into different accounts, including accounts in the names of nominees, to conceal the ownership, control and/or manipulative trading of the stock.

18.    A "nominee" was someone who owned an asset merely on paper, in order to disguise the true owner of the property. Nominees were used in connection with the formation of shell companies. Bank and brokerage accounts opened in the name of a shell company with a nominee were often referred to as "nominee accounts." Such accounts were then used in a pump-and-dump scheme by allowing the co-conspirators to give the appearance of an active market for a stock, when in fact the trades were being conducted among nominees controlled by co-conspirators. Nominee bank accounts were also often used to conceal the dissipation of the proceeds of the fraud.

19.    A "shell company" was a company which served as a vehicle for business transactions, such as opening bank and brokerage accounts, without itself having any significant assets or operations.

20.    Wash trades were purchases and sales of securities that matched each other in price, volume and time of execution, and involved no change in beneficial ownership. For example, a wash trade took place when Investor A bought 100 shares at $5.00 per share of Company A through Broker A while simultaneously selling 100 shares at $5.00 per share of Company A through Broker B. Wash trades were used to create the appearance that the stock price and volume rose as a result of genuine market demand for the securities.

21.     The "pump" involved artificially inflating a company's stock price and/or volume through various means that might include engaging in coordinated trading of the stock – usually by co-conspirators controlling both the buying and selling activity of the stock – to create the appearance of a more active market for that stock.  The pump might also involve disseminating false and misleading promotional materials – press releases purportedly from the company or advertisements touting the prospects of a company's stock – to encourage innocent investors to purchase the stock thus increasing sales volume.

22.     After pumping up the stock in the manner described above, the stock was "dumped," meaning large quantities of the shares owned and controlled by the co-conspirators were liquidated by selling to unsuspecting investors.

### The Scheme To Defraud

23.     In or about and between September 2008 and March 2014, the defendants Harold Bailey GALLISON, Ann Marie HISKEY, Carl KRUSE, JR., Carl KRUSE, SR., Frank ZANGARA, Charles MOELLER, Mark DRESNER, together with others, devised and engaged in a scheme whereby they agreed to defraud investors and potential investors in various United States publicly traded-companies, including Warrior Girl and Everock.  To further the scheme, defendants GALLISON, HISKEY, KRUSE JR., KRUSE SR., ZANGARA, MOELLER, DRESNER, together with others, fraudulently concealed the true ownership of various United States publicly traded companies, and engineered artificial price movements and trading volume in the stocks of the various U.S. publicly traded companies, including Warrior Girl and Everock. Defendants GALLISON, HISKEY, COLEMAN and RANDLES agreed to launder the proceeds of the securities fraud, including the proceeds from the sales of shares of Warrior Girl, Everock

and Bryn Resources, by moving money into and out of the United States through a series of nominee bank accounts.

24.     GALLISON, COLEMAN, RANDLES and others caused the creation of multiple United States and Costa Rican shell companies with nominee directors under the Moneyline umbrella.  Some of these entities included Bastille Advisors, Inc. ("Bastille"), a Nevada company; Sandias Azucaradas ("Sandias"), a Costa Rican company; Graytrader.com, a Panamanian company; and Vanilla Sky, Inc. ("Vanilla Sky"), a Costa Rican company (collectively, the "Moneyline Entities").

25.     GALLISON, COLEMAN, RANDLES and others used the Moneyline Entities to open brokerage accounts with multiple retail securities brokerage firms in the United States. They  used the Moneyline Entities to open bank accounts in the United States and offshore.

26.     GALLISON, HISKEY and others then directed clients of Moneyline to transfer shares of microcap companies, such as Warrior Girl, Everock and Bryn Resources, into various brokerage accounts in the names of the Moneyline Entities.  Doing so hid the true ownership and control over the shares, as it appeared to the brokerage firm and regulators that the true owners of the shares were the Moneyline Entities, as opposed to the clients of Moneyline.  Moneyline also internally allocated and distributed the shares that were deposited in the brokerage accounts to the clients of Moneyline, such as KRUSE JR., KRUSE SR., ZANGARA, DRESNER, and others, as well as transferred the shares between its clients, including stock promoters.  By transferring and allocating the shares internally, GALLISON, HISKEY and others concealed the true ownership and control of the shares.

27.     GALLISON, HISKEY and others then engaged in manipulative trading of, and/or

liquidated, the securities in the Moneyline Entity accounts. As the trading generated proceeds, they caused the proceeds of the fraud to be comingled with the proceeds of other stock sales that took place in the accounts.

28.     Once shares of companies such as Warrior Girl, Everock and Bryn Resources were liquidated and proceeds were generated in the brokerage accounts, GALLISON, HISKEY, COLEMAN, RANDLES and others then caused the transfer of the comingled trading proceeds to offshore accounts that they controlled. Sometimes, GALLISON, HISKEY, COLEMAN, RANDLES and others caused the proceeds to be transferred first to a bank account in the United States then offshore, while at other times they transferred the proceeds directly offshore.

29.     From the offshore accounts, GALLISON, HISKEY, RANDLES and others caused the further transfer of the proceeds as directed by their clients, including KRUSE JR., ZANGARA, MOELLER and DRESNER.

*Moneyline*

30.     Using Moneyline, GALLISON, RANDLES, HISKEY, COLEMAN and others assisted their clients with the facilitation of fraudulent stock deals and money laundering, and deliberately sought to circumvent U.S. securities laws and evade criminal and regulatory authorities.

31.     For example, on or about June 14, 2010, in a recorded call, KRUSE JR. expressed concern that, "[t]he stock, okay, Anna [HISKEY], just so I understand, the stock, though, legally is not in our name then anymore once we send it to you." HISKEY then explained to KRUSE JR. the process for depositing shares with Moneyline as well as the fact that the organization was

structured to conceal client trading activity and movement of the proceeds of the stock

liquidations:

> Right. Those 8.3 million shares [of Warrior Girl] are in Vanilla Sky's name right
> now. And that's why people like working with the offshore firm because, at the
> same time it, it is a little risky, let's say, for, for you, but everything's done
> through us, kind of protecting the client, and, there's not too much access to see
> what is happening and what kind of funds you're producing, and that's why
> people like using the offshore firm, our clients like using the offshore firm. But
> those 8.3 million shares, for instance, Carl [KRUSE JR.], is in Vanilla Sky name,
> it is in our name. If you wanted those shares back right now, what would happen
> is they'd get sent back to the [Transfer Agent] and we'd get them put back in
> whatever name that you'd want the shares put in, so . . . [y]ou will have one
> hundred percent control of the stock, so, it, it's just, it's in our name, which is
> beneficial in, in, in a, in a lot, in a big way, too, because all the stock is getting
> sold in our name, so…

32.     On or about January 1, 2010, in a recorded call with HISKEY, GALLISON

acknowledged his understanding that money laundering was illegal. In regard to a client wiring

in money and requesting it be wired right back out to a third party, GALLISON stated, "Why

couldn't [the client] just wire forty-nine grand from wherever he had the money to, uh, to this

person directly, you understand? Because [the client] doesn't want it to show that he wired this

person $49,000, okay?" GALLISON acknowledged that transactions concealing the true

ownership of money were "downright illegal," and that Moneyline shouldn't be laundering

funds, but agreed to the request "because [the client] ha[d] a history of doing stock business"

with Moneyline.

33.     On or about June 8, 2010, in a recorded call GALLISON explained to

COLEMAN that Moneyline's proprietary internal chat system, "GCC," was the "highest

possible level of security you can get" and why it was preferable to an internet service provider.

GALLISON stated, "Now, the advantages to this is, well, your Yahoo typically is set, unless you

clear the history and change it, it's set to, uh, keep 90-day history, okay?" GALLISON noted

that while an internet service provider did not retain chats for an extended period of time, "if the

Fed came in with a search warrant, they'd take your computer and it'd have your last ninety

days' worth of Yahoo messengers and Skype chats." GALLISON further explained that GCC

was kept on the users' desktop, and was "a throwaway program" on which they could have

private conversations and speak freely.

34.     Similarly, in a recorded call on or about May 18, 2010, GALLISON directed

RANDLES to clear his chat history for both Yahoo and Skype. GALLISON also noted that

Moneyline maintained a private internal telephone system that did not go through a U.S. server

on which he and RANDLES could hold "private conversation[s] that the Fed cannot get a

wiretap on."

35.     Moreover, on or about June 7, 2010, GALLISON conferred with RANDLES

about the possibility of a regulatory or criminal investigation into the activities of Moneyline.

When RANDLES expressed concern about traveling and the possibility of being "hauled off" of

a plane, GALLISON asserted that the SEC did not know what RANDLES had been doing and

noted it was "only for recidivist people that they turn over to the Department of Justice as a

referral, which not always, probably less than half the time the DOJ picks up, okay, and decides

to go ahead and prosecute as, as a criminal matter." GALLISON reassured RANDLES, stating,

"the whole issue with us is that, uh, uh, that uh, it's tough to, tough for anyone to figure out what

we really, what we're doing in the first place."

*The Warrior Girl "Pump-and-Dump" Scheme*

36.     Warrior Girl was incorporated in 2002 as a Nevada corporation.  Warrior Girl

stock was quoted on the OTC Markets Group under the ticker symbol "WRGL" and was

publicly traded.  Warrior Girl initially stated its business purpose was to "manufacture and

distribute women's and girl's [sic] clothing and apparel."  Thereafter, Warrior Girl's stated

business purpose underwent several iterations, changing to "an investment company," then to a

technology company dedicated to "effective energy independence for the United States," and

then to an oil extraction firm.  In 2010, Warrior Girl issued a series of press releases stating that

it was in the on-line education business and "focused on providing a quality education both

online and in the classroom."  From 2004 through 2010, Warrior Girl filed annual financial

statements with the OTC Markets Group.  For each year through 2010, Warrior Girl reported

both its annual revenue and expenses to be zero.

37.     KRUSE JR. and KRUSE SR. concealed, through a series of nominee brokerage

accounts and nominee bank accounts, that they controlled virtually all of the free trading shares

of Warrior Girl.  Nominee-1, a citizen of Denmark who resided in France, was listed as the

account owner for accounts holding Warrior Girl stock in the name of Fry Canyon Corporation

("Fry Canyon"), L.F. Technology Group, LLC ("L.F. Technology"), Starburst Innovations, LLC

("Starburst"), and Tachion Projects, Inc. ("Tachion") (collectively, the "Kruse Accounts").  In

fact, however, Fry Canyon, L.F. Technology, Starburst, and Tachion were controlled by KRUSE

JR. and were used as nominee entities that traded shares of Warrior Girl.

38.     Between in or around January and June 2009, trading in the Kruse Accounts

accounted for the majority of market activity in Warrior Girl stock. The Kruse Accounts were used to engage in a pattern of coordinated and pre-arranged trades to affect trading volume and price.

39.     In or around June 2009, a promotional campaign in the Eastern District of Virginia and elsewhere began touting Warrior Girl's purported business prospects. In a recorded conversation, KRUSE JR. told HISKEY that the promotion was orchestrated by him and KRUSE SR.

40.     In early 2010, KRUSE JR. and KRUSE SR., in order to conceal their ownership and control of their Warrior Girl shares, transferred approximately 14.9 million shares of Warrior Girl from the Kruse Accounts into brokerage accounts in the names of Moneyline Entities. This included the transfer of several million shares that was initiated by a letter from KRUSE JR. to a brokerage firm that maintained one of the Kruse Accounts that was located in the Eastern District of Virginia.

41.     GALLISON and HISKEY agreed with KRUSE JR. and KRUSE SR. to enlist other co-conspirators that were willing to engage in promotional activities and secret, coordinated trading in Warrior Girl shares in an effort to artificially inflate the price and volume of the shares, so that KRUSE JR. and KRUSE SR. could later sell their shares to unsuspecting investors at artificially inflated prices.

42.     In or about June 2010, KRUSE JR. and KRUSE SR. expressed their dissatisfaction with an earlier promotional campaign with defendant HISKEY. Thereafter, HISKEY and GALLISON openly discussed the fraudulent nature of the Warrior Girl stock manipulation, and the need for a promotional campaign. For example, in order to create the desired market volume, GALLISON told HISKEY that "[w]hat they really need, what he needs

to do, is, you know, does he, it's just a shell, it's a declared fucking shell. Are they going to put something there, announce a letter of intent for a property, can they do some news, or, or is it just, you know, oh, let's trade $8 million worth of stock on a shell with absolutely no news, okay?" GALLISON told HISKEY that he had a group of promoters in mind, and that "the 8.5 million [shares] they have with us [Moneyline] will probably generate [KRUSE JR.], you know, anywhere from probably about 30 million in market, you know, volume, anywhere from 25 to 35 million in market volume right now, and [KRUSE JR.] needs to have a shitload of stock somewhere else ready to sell."

43. In or around June 2010, GALLISON and HISKEY enlisted CC1, among others, to assist KRUSE JR. and KRUSE SR.'s efforts to create an artificial market for Warrior Girl shares by engaging in a promotional campaign, including drafting and disseminating press releases, and coordinated trading of Warrior Girl shares. To the investing public, these trades would have given the false appearance that there was an increasing market demand for Warrior Girl shares.

44. In or around June 2010, KRUSE JR., HISKEY and CC1 discussed the need to have multiple press releases ready to disseminate to promote the stock, which the co-conspirators needed to review in advance. For example, in or around June 2010, in response to HISKEY's questions about the promotional campaign, KRUSE JR. told HISKEY that, "It looks like I have three press releases here. We can come up with, you know, another ten, just to keep the pot, you know, the boiling kind of thing." KRUSE JR. and HISKEY also discussed how the Warrior Girl stock price would be manipulated, and how they would coordinate the liquidation of Warrior Girl shares through both the Moneyline nominee accounts and the Kruse Accounts.

45.     In or around July 2010, KRUSE JR., KRUSE SR., GALLISON, HISKEY, CC1, and others caused the issuance and dissemination nationally, including in the Eastern District of Virginia and elsewhere, of a Warrior Girl press release forecasting false and misleading revenue projections.

46.     After fraudulently inflating the price and volume of Warrior Girl stock, KRUSE JR., KRUSE SR., GALLISON and HISKEY, sold their shares of Warrior Girl to unsuspecting victim investors in the Eastern District of Virginia and elsewhere through the Kruse Accounts and nominee Moneyline accounts, thereby generating substantial illegal proceeds.

47.     After liquidating the Warrior Girl shares from the Moneyline accounts, KRUSE JR., GALLISON, HISKEY, RANDLES and others transferred the proceeds from nominee brokerage accounts in the United States, to bank accounts located overseas, and back to bank accounts in the United States in order to hide the source, ownership and control of the fraudulent proceeds.

48.     As a result of the scheme, between in or around January 2009 and in or around March 2014, the co-conspirators liquidated approximately 61 million shares of Warrior Girl, generating proceeds of approximately $2.9 million.

### The Everock "Pump-and-Dump" Scheme

49.     Everock was a Nevada corporation that purported to manufacture and market gourmet, kosher, and gluten-free condiments in the United States under the Nature's Peak brand name. Everock shares were publicly traded over the counter and quoted on the OTC Markets Group under the ticker symbol "EVRN."

50.     In order to effectuate the Everock pump-and-dump scheme, in or around August 2008, ZANGARA and MOELLER, together with CC3 and others known and unknown to the

-15-

Grand Jury, facilitated the merger of a shell company they controlled, Everock, with Nature's

Peak, a privately held operating company. ZANGARA, MOELLER, DRESNER, CC2, and

others represented to the CEO of then privately held Nature's Peak that a merger would enable

Nature's Peak to raise capital and grow its brand. In reality, ZANGARA, MOELLER,

DRESNER, CC3 and others utilized the merger to obtain nearly all of Everock's shares, which

they could then distribute to promoters and sell as part of the Everock pump-and-dump scheme.

51.     Beginning in or around March 2009, defendants ZANGARA and MOELLER

initiated the transfer of millions of their Everock shares into Moneyline-controlled nominee

brokerage accounts.

52.     ZANGARA and DRESNER then caused the distribution of the Everock shares

within Moneyline accounts to promoters who both touted Everock and made purchases of

Everock shares in the open market to increase the volume of trading in Everock stock. The

promotional materials included website postings, email blasts, and online videos, which were

disseminated in the Eastern District of Virginia and elsewhere, to create the appearance that

Everock had significant business and growth prospects, and to generate investor interest so that,

among other things, the investing public would take interest in Everock and purchase the shares

that ZANGARA and MOELLER controlled.

53.     In order to further the pump-and-dump scheme, ZANGARA and MOELLER

also caused the submission of false filings with OTC Markets Group, which were then available

to the investing public in the Eastern District of Virginia and elsewhere. In or around October

2009, MOELLER and ZANGARA caused the submission of an Annual Update Disclosure

Statement with the OTC Markets Group, falsely stating that MOELLER had "effectively"

returned 270 million of the 300 million shares he controlled to the company. In fact, MOELLER

did not return any of the shares to the company but instead continued to transfer millions of shares to various promoters while also liquidating tens of millions of shares through ZANGARA's corporate accounts and through various Moneyline accounts. The Annual Update Disclosure Statement also falsely indicated that Everock "does not retain a promoter," despite MOELLER and ZANGARA controlling the majority of the shares of Everock and paying for the promotions.

54.     Beginning in or around November 2009, ZANGARA and MOELLER caused the issuance and dissemination nationally, including in the Eastern District of Virginia, of false press releases that touted purported investments in Everock and Nature's Peak by CC2. In fact, the purported investments were actually proceeds generated through Moneyline that were provided by DRESNER, who unlike CC2 was not publicly affiliated with the company.

55.     Between in or around March 2010 and April 2010, ZANGARA and MOELLER caused the issuance and dissemination nationally, including in the Eastern District of Virginia, of multiple additional press releases that touted Everock's purported business prospects, while continuing to liquidate millions of shares of Everock. In or around April 2010, MOELLER, through his promoter entity Spectrum Research Group ("Spectrum"), issued a press release falsely stating that Spectrum would institute "full independent coverage" of Everock. The announcement included a misleading disclaimer that the company "may" have a beneficial interest in Everock when, in fact, MOELLER, ZANGARA and their co-conspirators controlled the vast majority of Everock shares that were available for sale.

56.     Throughout the summer of 2010, ZANGARA and MOELLER continued to liquidate tens of millions of Everock shares out of Moneyline accounts. ZANGARA, MOELLER, HISKEY, GALLISON and others, coordinated those sales. In response to tens of

millions of shares being transferred to Moneyline, GALLISON told a co-conspirator that he expected the Everock share price would run up on volume and that Moneyline would be able to liquidate all of the Everock shares once the promotions started, as the co-conspirators were "loading up for bear." Millions of the Everock shares transferred to Moneyline would then be transferred to promoters who were engaged to promote Everock. During the summer of 2010, ZANGARA, MOELLER, DRESNER, CC2, and others continued to cause the issuance and dissemination nationally, including in the Eastern District of Virginia, of multiple press releases touting Everock's business operations and opportunities in order to generate investor interest in the company.

57.     In connection with the summer-2010 promotional campaigns, GALLISON, HISKEY, ZANGARA and others discussed repeatedly the need to coordinate the sale of Everock shares with the press releases and promotional activities, and to secretly coordinate the liquidation of the Everock shares through multiple brokerage accounts. In or around mid-July 2010, GALLISON told HISKEY that "We've got 140 million shares and the clients want to sell it at the highest price possible but they want to sell every share.... sell it all, but don't want to hurt the market.... that sums it up. Meanwhile, we will be listening to all this babble and be shoveling it out with a pitchfork and a dumpster into the marketplace, because otherwise we would not sell any... I will have [the brokerage firm where Moneyline maintained one of its accounts] relentlessly serving up stock to fulfill the appetite of the market place."

58.     As the press releases were being disseminated simultaneously with the promotional campaigns they had initiated and funded, ZANGARA, DRESNER, GALLISON and HISKEY sold Everock shares to unsuspecting investors, including in the Eastern District of Virginia, reaping substantial illegal proceeds in the process.

-18-

59.     After selling the shares, GALLISON, HISKEY, ZANGARA, DRESNER, RANDLES, COLEMAN and others caused the proceeds of the scheme to be wired from brokerage accounts in the United States into Moneyline Entity offshore accounts, then back into different accounts in the United States in order to hide the source, ownership and control of the illegal proceeds.

60.     As a result of the scheme, between in or around September 2008 and in or around September 2010, the co-conspirators liquidated approximately 382 million shares of Everock, generating proceeds of approximately $3.6 million.

*The Bryn Resources Money Laundering Scheme*

61.     Bryn Resources was a Colorado company with purported headquarters in Ontario, Canada, that purported to engage in mining and exploration of precious metals in Canada.  Bryn Resources shares were publicly traded over the counter and quoted on the OTC Markets Group under the ticker symbol "BRYN."

62.     In or around November 2008, COLEMAN opened a brokerage account in the name of Bastille Advisors with a brokerage firm located in Merrifield, Virginia, within the Eastern District of Virginia.

63.     Beginning in or around November 2009, a group of Moneyline's clients, who held a controlling interest in Bryn Resources deposited their shares in Moneyline controlled accounts, with some of those shares being deposited into the Bastille Advisors account in the Eastern District of Virginia.

64.     In or around November and December 2009, a promotional campaign touting Bryn Resources took place, which included the issuance of press releases and the touting of Bryn

Resources' purported assets and operations on websites.   During this same time period,

Moneyline sold over 3.5 million shares of Bryn Resources, generating proceeds of approximately

$756,000.

65.     The sale of Bryn Resources shares from Moneyline accounts continued until

approximately August 2010, when the majority of the shares in the Moneyline accounts had been

liquidated.

66.     Following the liquidation of shares, COLEMAN caused the transfer of the

proceeds from Moneyline accounts in the United States to Moneyline offshore accounts.

67.     On or about June 30, 2010, while still holding Bryn Resources shares in

Moneyline accounts, GALLISON discussed the fraudulent promotion of Bryn Resources, as well

as the fact that a client of Moneyline who had been involved with the Bryn Resources promotion

had been charged by the Securities and Exchange Commission (the "SEC") for a number of

other pump-and-dump schemes.  During the discussion, GALLISON explained that "[e]veryone

acknowledges that they're just a pump-and-dump outfit. Wildly successful. They did the BRYN

deal. . . . Their outrageous claims by their in-house newsletter writers were just bogus bullshit."

When GALLISON mentioned that the client's money had been frozen as part of the SEC

charges, RANDLES responded, "I bet now they're wishing they would have left some money

with us."

## COUNT ONE

*Conspiracy to Commit Wire Fraud – Warrior Girl (18 U.S.C. § 1349)*

THE GRAND JURY FURTHER CHARGES THAT:

68.     Paragraphs 1 through 3, 5 through 6, 10, and 13 through 35 of the Indictment are incorporated here by reference.

69.     Beginning on a date unknown to the United States, but at least as early as in or about January 2009, and continuing through at least in or about March 2014, in the Eastern District of Virginia and elsewhere, defendants GALLISON, HISKEY, KRUSE JR., and KRUSE SR., together with their co-conspirators, and others known and unknown to the Grand Jury, did knowingly and willfully combine, conspire, confederate and agree with each other and others known and unknown to the Grand Jury to commit certain offenses against the United States, namely, wire fraud, that is, having devised a scheme and artifice to defraud and obtain money and property from investors in Warrior Girl's common stock by means of materially false and fraudulent pretenses, representations, and promises, to knowingly and willfully use interstate wires for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

### Purpose of the Conspiracy

70.     The purpose of the conspiracy was to unjustly enrich the defendants and their co-conspirators, through the sale of securities to the general investing public, by artificially inflating the market prices of, volume of, and demand for the common stock of Warrior Girl.

### Manner and Means of the Conspiracy

71.     Paragraphs 36 through 48 of the Indictment are incorporated here by reference as the manner and means of the conspiracy.

(In violation of Title 18, United States Code, Section 1349.)

## COUNT TWO

*Securities Fraud – Warrior Girl (15 U.S.C. §§ 78j (b) & 78ff; 18 U.S.C. § 2)*

THE GRAND JURY FURTHER CHARGES THAT:

72.     Paragraphs 1 through 3, 5 through 6, 10, and 13 through 48 of the Indictment are incorporated here by reference.

73.     Beginning on a date unknown to the United States, but at least as early as in or about January 2009, and continuing through at least in or about March 2014, in the Eastern District of Virginia and elsewhere, the defendants GALLISON, HISKEY, KRUSE JR., and KRUSE SR., together with their co-conspirators, and others known and unknown to the Grand Jury, did knowingly and willfully use and employ, attempt to use and employ, and aid and abet in the use and employment of one or more manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing one or more devices, schemes and artifices to defraud; (b) making one or more untrue statements of material fact and omitting to state one or more material facts necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; and (c) engaging in one or more acts, practices and courses of business which would operate as a fraud and deceit upon one or more investors or potential investors in Warrior Girl, in connection with the purchases and sales of investments in Warrior Girl, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails.

(In violation of Title 15, United States Code, Sections 78j (b) and 78ff, and Title 18, United States Code, Section 2.)

-22-

## COUNT THREE

*Conspiracy to Commit Wire Fraud – Everock (18 U.S.C. § 1349)*

THE GRAND JURY FURTHER CHARGES THAT:

74.     Paragraphs 1 through 4, 7 through 9, and 11 through 35 of the Indictment are incorporated here by reference.

75.     Beginning on a date unknown to the United States, but at least as early as in or about September 2008, and continuing through at least in or about September 2010, in the Eastern District of Virginia and elsewhere, defendants GALLISON, HISKEY, ZANGARA, MOELLER, and DRESNER, together with their co-conspirators, and others known and unknown to the Grand Jury, did knowingly and willfully combine, conspire, confederate and agree with each other and others known and unknown to the Grand Jury to commit certain offenses against the United States, namely, wire fraud, that is, having devised a scheme and artifice to defraud and obtain money and property from investors in Everock's common stock by means of materially false and fraudulent pretenses, representations, and promises, to knowingly and willfully use interstate wires for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

### *Purpose of the Conspiracy*

76.     The purpose of the conspiracy was to unjustly enrich the defendants and their co-conspirators, through the sale of securities to the general investing public, by artificially inflating the market prices of, volume of, and demand for the common stock of Everock.

### *Manner and Means of the Conspiracy*

77.     Paragraphs 49 through 60 of the Indictment are incorporated here by reference as the manner and means of the conspiracy.

-23-

(In violation of Title 18, United States Code, Section 1349.)

### COUNT FOUR

*Securities Fraud – Everock (15 U.S.C. §§ 78j (b) & 78ff; 18 U.S.C. § 2)*

THE GRAND JURY FURTHER CHARGES THAT:

78.     Paragraphs 1 through 4, 7 through 9, 11 through 35, and 49 through 60 of the Indictment are incorporated here by reference.

79.     Beginning on a date unknown to the United States, but at least as early as in or about September 2008, and continuing through at least in or about September 2010, in the Eastern District of Virginia and elsewhere, the defendants GALLISON, HISKEY, ZANGARA, MOELLER, and DRESNER, together with their co-conspirators and others known and unknown to the Grand Jury, did knowingly and willfully use and employ, attempt to use and employ, and aid and abet in the use and employment of one or more manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing one or more devices, schemes and artifices to defraud; (b) making one or more untrue statements of material fact and omitting to state one or more material facts necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; and (c) engaging in one or more acts, practices and courses of business which would operate as a fraud and deceit upon one or more investors or potential investors in Everock, in connection with the purchases and sales of investments in Everock, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails.

(In violation of Title 15, United States Code, Sections 78j (b) and 78ff, and Title 18, United States Code, Section 2.)

-24-

## COUNT FIVE

*Conspiracy to Commit Money Laundering (18 U.S.C. § 1956(h))*

THE GRAND JURY FURTHER CHARGES THAT:

80.     Paragraphs 1 through 67 of the Indictment are incorporated here by reference.

81.     Beginning on a date unknown to the United States, but at least as early as in or about 2008, and continuing through at least in or about the date of this Indictment, in the Eastern District of Virginia and elsewhere, the defendants GALLISON, HISKEY, COLEMAN and RANDLES, together with others known and unknown to the Grand Jury, did knowingly and willfully conspire to transport, transmit and transfer a monetary instrument and funds from a place in the United States to and through a place outside the United States and to a place in the United States from and through a place outside the United States knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer was designed in whole or in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of the specified unlawful activities, contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i).

*Manner and Means of the Conspiracy*

82.     Paragraphs 23 through 35 of the Indictment are incorporated here by reference as the manner and means of the conspiracy.

(In violation of Title 18, United States Code, Section 1956(h).)

**FORFEITURE NOTICE**

Pursuant to Rule 32.2(a), the defendants are hereby notified that, if convicted of either the conspiracy charge in Count One or Count Three, or the securities fraud charge in Count 2 or Count 4 of this Indictment, defendants shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(l)(C) and Title 28, United States Code, Section 2461, any property, real or personal, which constitutes or is derived from proceeds traceable to wire fraud, in violation of Title 18, United States Code, Section 1343, and securities fraud, in violation of Title 15, United States Code, Section 78ff, including a sum of money equal to at least $2.9 million in United States currency, representing the amount of proceeds obtained as a result of the conspiracy charged in Count One, and the securities fraud charged in Count Two, and a sum of money equal to at least $3.6 million in United States currency, representing the amount of proceeds obtained as a result of the conspiracy charged in Count Three, and the securities fraud charged in Count Four, and for which the defendants are jointly and severally liable.

If convicted of the money laundering conspiracy alleged in Count Five, the defendants shall forfeit any property, real or personal, involved in the offense, or any property traceable to such property, pursuant to Title 18, United States Code, Section 982(a).

Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 246 l(c) and by Title 18, United States Code, Section 982(b)(2), the defendant shall forfeit substitute property, up to the value of the amount described, i.e., $2.9 million in United States currency as to Count One and Count Two, and $3.6 million in United States currency as to Count Three and Count Four, if, by any act or omission of the defendant, the $2.9 million in United States currency as to Count One and Count Two, and $3.6 million in United States currency as to Count Three and Count Four, or any portion thereof, cannot be

located upon the exercise of due diligence; has been transferred, sold to, or deposited with a third

party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in

value; or has been commingled with other property which cannot be divided without difficulty.

The property subject to forfeiture includes, but is not limited to, the property listed in

Attachment A.

(Pursuant to Title 18, United States Code, Sections 981 and 982, and Title 21, United States

Code, Section 853(p), and Title 28, United States Code, Section 2461.)

A TRUE BILL

Pursuant to the E-Government Act,
the original of this page has been filed
under seal in the Clerk's Office.

_____
FOREPERSON


DANA J. BOENTE
UNITED STATES ATTORNEY

By:  _____
James P. Gillis
Zachary Terwilliger
Assistant United States Attorneys


ANDREW WEISSMANN
CHIEF
FRAUD SECTION, CRIMINAL DIVISION
UNITED STATES DEPARTMENT OF JUSTICE


By:  _____
N. Nathan Dimock
Senior Trial Attorney
Fraud Section, Criminal Division
United States Department of Justice

## ATTACHMENT A

| Financial Institution | Account Number | Account Name |
|---|---|---|
| Albert Fried & Company LLC | 020-00032 | Bastille Advisors Inc. |
| Albert Fried & Company LLC | 020-00248 | Jurojin, Inc. |
| Alpine Securities Corporation | 645660349 | Rembrandt Capital Corporation |
| Alpine Securities Corporation | 677015958 | Stix Pix, Inc. |
| Alpine Securities Corporation | 76453355 | Tachion Projects Inc. c/o Jens Henriksen |
| Alpine Securities Corporation | 76433550 | Tachion Projects Inc. c/o Jens Henriksen |
| Alpine Securities Corporation | 707994437 | Tachion Projects Inc. |
| America First Credit Union | 7486186 | Bastille Advisors, Inc. |
| America First Credit Union | 7460007486152 | Corporate Capital Formation Inc. |
| America First Credit Union | 7460340068700 | Roger G. Coleman Sr. |
| American First National Bank | 800101065 | Vanilla Sky NV, Inc. |
| American First National Bank | 800101073 | Jurojin, Inc. |
| Apex Clearing Corporation (formerly Penson Financial Services) | 2GJ-13431-17 | Tachion Projects Inc. |
| Apex Clearing Corporation (formerly Penson | 2KM-07465-17 | Tachion Projects Inc. |

| | | |
|---|---|---|
| Financial Services) | | |
| Apex Clearing Corporation (formerly Penson Financial Services) | 46708083-12 | Tachion Projects Inc. |
| Apex Clearing Corporation (formerly Penson Financial Services) | 4ZC-08778-18 | Starburst Innovations LLC |
| Apex Clearing Corporation (formerly Penson Financial Services) | 4ZC-09866-19 | Carl H. Kruse |
| Apex Clearing Corporation (formerly Penson Financial Services) | 5AG-05407-19 | Fry Canyon Corporation |
| Apex Clearing Corporation (formerly Penson Financial Services) | 57390445 | Bastille Advisors |
| Apex Clearing Corporation (formerly Penson Financial Services) | 57384422 | Club Consultants |
| Apex Clearing Corporation (formerly Penson Financial Services) | 12953758 | Club Consultants Inc. |
| Apex Clearing Corporation (formerly Penson Financial Services) | 81340879 | Club Consultants, Inc. |
| Apex Clearing Corporation (formerly Penson Financial Services) | 57384422 | Club Consultants, Inc. |
| Apex Clearing | 5AG05407 | Fry Canyon Corp. |

| | | |
|---|---|---|
| Corporation (formerly Penson Financial Services) | | |
| Apex Clearing Corporation (formerly Penson Financial Services) | 32231060/4ZC-07563-19 | Sandias Azucaradas, CR S.A. |
| Apex Clearing Corporation (formerly Penson Financial Services) | 32436867/4ZC12617 | Vanilla Sky, S.A. |
| Apex Clearing Corporation (formerly Penson Financial Services) | 45003514 | Glenwood Marketing, Attn: Therese Zangara |
| Apex Clearing Corporation (formerly Penson Financial Services) | 57397317 | The BHI Group Inc., Attn: Frank J. Zangara |
| Apex Clearing Corporation (formerly Penson Financial Services) | 4ZR05439 | Glenwood Marketing c/o Therese Zangara |
| Apex Clearing Corporation (formerly Penson Financial Services) | 34095380 | Glenwood Marketing Inc. |
| Apex Clearing Corporation (formerly Penson Financial Services) | 34090142 | The BHI Group Inc. |
| Bank of America | 501009319181 | **Carmel Business Consultants** |
| Bank of America | 483003726050 | **Digital Edge Marketing LLC** |
| Bank of America | Unknown | **Michael Jay Randles** |
| Bank of America | 20411005 | Sandias Azucaradas of NV, Inc. |
| Barclays Bank PLC | 21853620101 | Carl Kruse |

| California Bank & Trust | 2280185891 | Faith Services, Inc. |
|---|---|---|
| California Bank & Trust | 2280588236 | Harold Gallison |
| California Bank & Trust | 2280186191 | Valley Shores, Ltd. |
| Charles Schwab | 8216-8430 | Club Consultants Inc. |
| Citibank NA | 42006715785 | Harold B. Gallison |
| Comerica Bank | 1894767159 | Faith Services, Inc. |
| E*Trade Securities LLC | 60610219 | Starburst Innovations LLC |
| E*Trade Securities LLC | 49086615 | Carl Kruse, Jr. |
| E*Trade Securities LLC | 49086811 | Carl Kruse, Jr. |
| E*Trade Securities LLC | 62544443 | Bastille Advisors, Inc. |
| E*Trade Securities LLC | 60192069 | Carl Kruse |
| E*Trade Securities LLC | 63322461 | Jurojin, Inc. |
| E*Trade Securities LLC | 67256873 | LF Technology Group LLC |
| EverBank | 760078351 | Stix Pix, Inc. |
| First Republic Bank | 80000738071 | Faith Services, Inc. |
| J.H. Darbie & Co. | 365-02395 | Club Consultant's, Inc. |
| JP Morgan Chase | 3080063519 | Corporate Capital Formation |
| JPMorgan Chase Bank | 4214457073 | Michael Jay Randles |
| JPMorgan Chase Bank | 989918719 | Stix Pix, Inc. |
| JPMorgan Chase | 825141249 | The BHI Group |

| Bank | | |
|------|------|------|
| JPMorgan Chase Bank | 8850939312 | Bastille Advisors, Inc. |
| JPMorgan Chase Bank | 3162812355 | Bayswater, Inc. |
| JPMorgan Chase Bank | 8314603239 | Leonor K. Kruse and Carl H. Kruse |
| JPMorgan Chase Bank | 860561828 | Charles S. Moeller |
| JPMorgan Chase Bank | 860563097 | Charles S. Moeller |
| JPMorgan Chase Bank | 2949056754 | Charles S. Moeller |
| JPMorgan Chase Bank | 904452877 | Club Consultants Inc. |
| JPMorgan Chase Bank | 824950497 | Faith Services, Inc. |
| JPMorgan Chase Bank | 740370978 | Frank Zangara |
| JPMorgan Chase Bank | 818712259 | Glenwood Marketing Inc. dba Keenzo Online |
| JPMorgan Chase Bank | 818763021 | Glenwood Marketing Inc. dba Keenzo Online |
| JPMorgan Chase Bank | 3923150001 | Harold B. Gallison |
| JPMorgan Chase Bank | 1961907393 | Harold B. Gallison |
| JPMorgan Chase Bank | 4941084313 | Jurojin, Inc. |
| JPMorgan Chase Bank | 4214457073 | Michael Jay Randles |
| JPMorgan Chase Bank | 8850940757 | Roger G. Coleman |
| JPMorgan Chase | 427540037244 | Roger G. Coleman |

| | | |
|---|---|---|
| Bank | | |
| JPMorgan Chase Bank | 5416578001958080 | Roger Coleman |
| JPMorgan Chase Bank | 3151905749 | Sandias Azucaradas of NV, Inc. |
| JPMorgan Chase Bank | 825143748 | Glenwood Marketing Assoc. Inc. c/o Frank Zangara |
| JPMorgan Chase Bank | 791391568 | UDF Consulting Inc. |
| JPMorgan Chase Bank | 4941084850 | Valley Shores, Ltd. |
| JPMorgan Chase Bank | 572518830 | Zyrox Mining International Inc. |
| JPMorgan Chase Bank | 1773612883 | Carl Kruse III |
| JPMorgan Chase Bank | 994295442 | Kruho Ventures Corp. |
| JPMorgan Chase Bank | 532527293 | Escape LLC |
| Ridge Clearing and Outsourcing (BMA Securities) | 466-02090-18 | B.H.I. Group Inc., Attn:  Frank Zangara |
| Scottsdale Capital Advisors | 57390445 | Bastille Advisors Inc. |
| Scottsdale Capital Advisors | 57384422 | Club Consultants Inc. |
| Spencer Edwards | 645660349 | Rembrandt Capital Corporation |
| Spencer Edwards | 677015958 | Stix Pix, Inc. |
| TD Ameritrade Inc | 864493070 | Zyrox Mining International Inc. |
| TD Ameritrade Inc | 756310265 | Carl H. Kruse Sr. |
| TD Ameritrade Inc | 780010603 | Frank Zangara IRA |
| TD Ameritrade Inc | 780584675 | Frank Zangara |

| TD Ameritrade Inc | 754817887 | Charles Moeller |
|---|---|---|
| TD Ameritrade Inc | 757079520 | Charles Moeller Rollover IRA TD |
| Track Data Securities Corp | 32490641/4ZC16163 | Bastille Advisors, Inc. |
| Track Data Securities Corp | 32529828/4ZC19232 | Jurojin, Inc. |
| Track Data Securities Corp | 4ZC-29354-16 RR 000 | Stix Pix, Inc. |
| Track Data Securities Corp | 32436867/4ZC12617 | Vanilla Sky S.A. |
| Wedbush | 13514664 | Carl Kruse |
| Wedbush | 84125915 | Carl Kruse |
| Wedbush | 79902428 | Tachion Projects Inc. |
| Wells Fargo Bank | xxxxxx3609 | Certificate Processing International |
| Wells Fargo Bank | 9675306139 | Club Consultant's, Inc. |
| Wells Fargo Bank | 1904270814 | Stix Pix, Inc. |
| Wells Fargo Bank | 50750010 | Jurojin, Inc. |
| Wells Fargo Bank | 3060567214 | Valley Shores, Ltd. |
| Wells Fargo Bank | 3217496268 | Avatar Consulting |
| Wells Fargo Bank | 1866593609 | Certificate Processing International |
| Wilson-Davis & Company | 449681007836 | Club Consultants, Inc. |
| Wilson-Davis & Company | 181641164 | Stix Pix, Inc. |
| | | |
| | | |
| International Banks | | |
| Credicorp Bank | 4020226011 | Vanilla Sky S.A. |
| Credicorp Bank | 4020226027 | Graytrader.com S.A. |

| FPB Bank (Panama) | 8901117250 | Rembrandt Capital Corporation |
| HSBC Bank (Panama) S.A. | 100026989 | Sandias Azucaradas |
| Saxo Bank | 60366026 | Rembrandt Capital Corporation |
| Rietumu Bank | LV16RTMB0000619806127 | Vanilla Sky S.A. |
| Rietumu Bank | LV92RTMB0000619806117 | Jurojin Inc. |